ELIZABETH D. De LANCEY, Respondent, v. HENRY PIEP-
GRAS, Appellant, and Another, Respondent, Impleaded
with Others, Defendants.

*Grant from the crown, reserving rent but not a right to re-enter — a forfeiture may
be enforced — it enures to the benefit of the people — presumption of regularity —
adverse possession — a grant bounded on navigable waters.*

A grant from the crown of lands under water reserved forever a yearly rent. It
contained no clause creating a forfeiture or reserving a right of re-entry. No rent
was ever paid, and after the Revolution the legislature passed acts allowing
redemption, and declaring that unless redeemed the lands should be sold as
forfeited to the people for non-payment of rent.

In 1826 the lands in question were sold, and were, in 1836, conveyed by the comp
troller to one Hunter, who occupied them for nearly thirty years, at the end of
which time the commissioners of the land office assumed to grant them to a
third party.

In an action of ejectment, brought against such last-mentioned grantee by the
successors in title of Hunter:

*Held,* that payment of rent was an implied condition of the grant, although there
was reserved no right of distress or re-entry.

That this implied condition was a condition subsequent, and that the grantor had
a right to enforce a forfeiture for non-payment of the rent.

That the forfeiture enured to the benefit of the people of the State, who thereby
became owners of the land.

That the purchaser at the comptroller's sale was not bound to show that the
comptroller had complied with the statute as to giving notice of the sale, etc.

That the court would presume that the sale made by the comptroller in 1826 was
regular.

That if any person was "in actual possession and occupancy" of the land at the
time of the sale in 1826, and did not receive the statutory notice of the sale,
the defect was cured by the adverse possession of Hunter under his deed.

That, as the people had parted with their title in 1826, the subsequent grant of
the commissioners of the land office was void.

That a grant of land bounded by Long Island sound carried the title to high-water
mark only.

Appeal by the defendant Henry Piepgras from two judgments
of the Supreme Court, entered, after a trial at the Westchester
Circuit before the court and a jury, in the office of the clerk of
Westchester county on the 19th day of June, 1891, in favor of the
plaintiff Elizabeth D. De Lancey, and the defendant John Hunter

against the defendant Henry Piepgras, one adjudging that the plaintiff was seized of three-quarters of certain premises, and the other adjudging that the defendant John Hunter was seized of one-quarter thereof, and that each was entitled to recover from the defendant Piepgras possession of such respective parts of the premises.

*James R. Steers,* for the appellant.

*John Hunter, Jr.,* for the defendant, respondent.

*Walter D. Edmonds,* for the plaintiff, respondent.

DYKMAN, J.:

This is an action of ejectment for the recovery of the possession of land under the waters of Long Island sound outside of Mineford's island, now called City Island, in the county of Westchester. The plaintiff and the defendant, John Hunter, are children of Elias D. Hunter, deceased, and they claim the premises through him, and they have succeeded to his rights which were derived in this way:

The lands in question were included in a grant from the crown of Great Britian to Benjamin Palmer, his heirs and assigns, bearing date May 27, 1763, reserving a yearly rent of five shillings sterling to be paid to the collector at the custom-house in the city of New York yearly on Lady Day.

No rent was ever paid, and after the people succeeded to the rights of the crown the legislature of the State of New York passed a number of acts directing the grantees of lands chargeable with unpaid quit rents to come in and redeem the same, and declaring in case of failure to do so that such land should be sold as lands forfeited to the people of the State by reason of the non-payment of such rents. (Laws of 1787, chap. 76; Laws of 1788, chap. 39; Laws of 1801, chap. 187, and Laws of 1813.)

Finally, in the year 1819, a law was passed by the legislature of the State of New York, which directed all the lands so forfeited to be sold by the comptroller of the State, after advertising such sales in the manner prescribed by the act. (Laws of 1819, chap. 222.)

The sale thus directed was postponed from time to time by acts of the legislature (Laws of 1821, chap. 241; Laws of 1823, chap. 104;

Laws of 1824, chap. 225, and Laws of 1825, chap. 251) until March 26, 1826, when the land was sold by the comptroller at public auction to James Van Vechten.

Two years were allowed for redemption, and the original purchaser, Van Vechten, having transferred his interest to Elias D. Hunter, a deed was executed and delivered to him by the comptroller for the premises, dated April 5, 1836.

Hunter assumed possession by renting the premises to a tenant, who continued to occupy them until about the year 1865, and built a dock upon them to facilitate his occupation.

The defendant Piepgras claims title to the premises by three grants from the commissioners of the land office, bearing date December 3, 1863, October 21, 1875, and January 15, 1891, respectively.

In passing the acts which led up to the sale of these premises, the legislature proceeded upon the assumption of a forfeiture of the title for the non-payment of the rent reserved in the grant to Palmer, and the validity of the Hunter title depends upon the accuracy of that theory.

There is no clause in the Palmer patent creating a forfeiture or reserving a right of re-entry for non-payment of rent, the language being : " Yielding, rendering and paying therefore yearly and every year forever    *    *    *    the yearly rent of five shillings sterling." But we think the payment of such rent was an implied condition upon which the land was held.

The grant to Palmer was a conveyance in fee, reserving a perpetual rent, or, as it is sometimes expressed, it was the letting of lands to farm in fee simple.   But the grant reserves no right of distress or re-entry, and, therefore, the rent is called a quit rent, because at the common law the lord could not distrain therefor.

In such grants the rents were always considered as conditions annexed to the grant by implication of law, and if the tenant was in default for the non-payment of rent the lord might resume the fee.   (4 Kent's Com., 122 ; Wash. on Real Prop. [5th ed.] ; 6 Gerard's Titles [3d ed.], 118.

" Estates which men have upon condition in law are such estates which have a condition by the law to them annexed, albeit that it be not specified in writing,    *    *    *    and such condition as is intended

by the law to be annexed to anything is as strong as if the condition were put in writing, * * * also estates of lands and tenements may be made upon condition in law, albeit upon the estate made there was not any mention or rehearsal made of this condition." (Littleton, §§ 379, 380.)

A reservation of a right to re-enter for non-payment of rent was not an essential requisite to the right to maintain ejectment in the event of a breach. (4 Kent's Com., 123.)

The condition implied in this case was a condition subsequent and followed the vesting of the estate, and the rent reserved furnished the grantor with a vested interest and a right to enforce the forfeiture.

The act of 1826, which directed a sale of these lands by the comptroller of the State, directed him to give notice of such sale in certain ways, and the appellant now contends that proof of compliance with such direction was necessary to establish the validity of the comptroller's deed of conveyance given in pursuance of such sale, but the contention is erroneous.

Under our conclusion the land had been forfeited to the crown before our Revolution of 1776, and that forfeiture had enured to the people of this State, who thus and then became the owner of the premises. Being such owner the State, through its legislature, appointed the comptroller its agent to sell the land and gave him certain directions respecting his mode of procedure in making such sale. We may presume that he followed his instructions, because it was his official duty to do so, but whether he did or not is quite immaterial, so far as a purchaser at his sale is concerned.

The sale of the land in question bears no analogy to sales for unpaid taxes. Such sales are in derogation of private right designed to divest the owner of his title, and a strict observance of the requirements of the statute is essential to their validity.

Under our system of jurisprudence the right to life, liberty and property is protected with great jealousy and cannot be invaded without the observance of all the safeguards provided for its protection. No such principles or rights are involved in this sale, which, reduced to simplicity, is a sale of land by an agent appointed by the owner, with certain instructions respecting the formalities of the sale which

do not affect the power. The power to sell was ample, and it was fully executed and no one can complain of the disobedience of instructions by the agent, if any there was, except the owner.

The deed of conveyance is in pursuance of the power and is conclusive evidence of the regularity of the sale.

In relation to the requirement of notice of the sale to a person in " actual possession and occupancy " of the land sold it is sufficient to say, first, that no such possession or occupancy was shown, and, second, if there was any omission in that respect, the defect was cured by the long possession of Hunter under his deed of conveyance, which was open and adverse to all.

As the appellant endeavors to bring the Pell patent to his assistance, it will be necessary to make some examination of that instrument. It was a grant of land situated on the main land, bounded and described as follows: " All that certaine tract of land upon the maine lyeing and being to the eastward of Westchester Bounds. Bounded to the Westward with a river called by the Indians Aqueconounck, commonly known to the English by the name of Hutchinson's River, which runeth into the Bay lying between Throgmorton's neck and Annehooke's neck, commonly called Hutchinson's Bay, bounded on the East by a Brooke called Cedar Tree Brooke or Gravelly brooke, on the south by the Sound which lyeth between Long Island and the maine land." With all the islands on the sound not before that time granted or disposed of lying before that tract of land so bounded. This description is taken from the Dongan charter of confirmation to John Pell, dated October 20, 1687.

The grant is bounded by the sound, which was a navigable tide water, and carried the title to high-water mark only. (3 Kent's Com., 432; *Gould* v. *R. R. Co.*, 6 N. Y., 522; *Brookhaven* v. *Strong*, 60 id., 65.)

As the land granted to Palmer was below high-water mark, there was no repugnance or incompatibility between the two grants, and the appellant can derive no benefit from the patent to Pell.

The cases of *Rogers* v. *Jones* (1 Wend., 237); *Brookhaven* v. *Strong* (*supra*) and *Robins* v. *Ackerly* (91 N. Y., 98) are cited by the appellant to show that the grant to Pell must be construed to include the land under the waters of the sound, but those cases only decide that land under water will pass if it lies within the bounds of the

grant and they are, therefore, unavailing, as we have already seen that the lands in question were not included within the boundaries of the grant to Pell.

Neither is there any force in the insistence of the appellant that Palmer received his grant in trust for others, because it plainly invested him with the absolute title.

It is to be said, in relation to the claim of the appellants, that if our position on this question is correct, then the grants under which he claims conveyed no title, as the State had before that parted with all its interest and had nothing to grant.

Our conclusion is in favor of the plaintiff, not only upon a careful and critical examination, but upon a broad and comprehensive view in the light of reason and justice.

The crown made an absolute grant to Palmer in fee, reserving rent, payable at a specified time and at a designated place. The rent was unpaid, and the lands were forfeited to the crown for such non-payment. Then the Revolution intervened and the people became vested with the rights of the crown, and the legislature declared the forfeiture and sold the lands and conveyed them to Hunter, who used and occupied them for thirty years. His title came to the plaintiff and the defendant John Hunter.

The appellant has three water grants from the commissioners of the land office, all of which are void, because the State had parted with its title long years before their date.

We find no ground for hesitation, and the judgment and order denying the motion for a new trial should be affirmed, with costs.

PRATT, J., concurred; BARNARD, P. J., not sitting.

Judgment affirmed, with costs.